JOSEPH P. KELLY,                    :
                                   :
          Plaintiff                :        No. 3:14-CV-02008
                                   :
     vs.                            :        (Judge Nealon)
                                   :
CAROLYN W. COLVIN, ACTING           :
COMMISSIONER OF SOCIAL              :
SECURITY,                           :
                                   :
          Defendant                :

## MEMORANDUM

## BACKGROUND

The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff Joseph P. Kelly's claim for social security disability insurance benefits and supplemental security income benefits.

On October 19, 2011, Kelly protectively filed[1] an application for supplemental security and on November 2, 2011, an application for disability insurance income benefits. Tr. 17, 184-200, 201 and 218.[2]  On January 5, 2012, the Bureau of Disability

_____

1.  Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits.  A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

2.  References to "Tr.__" are to pages of the administrative record filed by the Defendant as part of his Answer on December 22, 2014.

Determination[3] denied Kelly's applications. Tr. 156-165. On February 11, 2012, Kelly requested a hearing before an administrative law judge. Tr. 17 and 167. Approximately 10 months later, a hearing was held on December 10, 2012, before an administrative law judge. Tr. 60-131. On January 22, 2013, the administrative law judge issued a decision denying Kelly's applications. Tr. 17-31. As will be explained in more detail *infra* the administrative law judge found that Kelly failed to prove that he met the requirements of a listed impairment or suffered from work-preclusive functional limitations. Id. On March 19, 2013, Kelly requested that the Appeals Council review the administrative law judge's decision. Tr. 11-12. After 17 months had passed, the Appeals Council on August 20, 2014, concluded that there was no basis upon which to grant Kelly's request for review. Tr. 1-3. Thus, the administrative law judge's decision stood as the final decision of the Commissioner.

Kelly then filed a complaint in this court on October 16, 2014. Supporting and opposing briefs were submitted and the

---

3. The Bureau of Disability Determination is an agency of the Commonwealth of Pennsylvania which initially evaluates applications for disability insurance benefits and supplemental security income benefits on behalf of the Social Security Administration. Tr. 157 and 162.

appeal[4] became ripe for disposition on March 18, 2015, when Kelly filed a reply brief.

Disability insurance benefits are paid to an individual if that individual is disabled and "insured," that is, the individual has worked long enough and paid social security taxes. The last date that a claimant meets the requirements of being insured is commonly referred to as the "date last insured." It is undisputed that Kelly meets the insured status requirements of the Social Security Act through December 31, 2015. Tr. 17, 19 and 201.

Supplemental security income (SSI) is a federal income supplement program funded by general tax revenues (not social security taxes). It is designed to help aged, blind or other disabled individuals who have little or no income.

Kelly was born in the United States on January 22, 1986, and at all times relevant to this matter was considered a "younger individual"[5] whose age would not seriously impact his ability to adjust to other work. 20 C.F.R. §§ 404.1563(c) and 416.963(c). Tr. 184 and 191. The administrative law judge issued his decision on Kelly's 27th birthday.

---

4.  Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal." M.D.Pa. Local Rule 83.40.1.

5.  The Social Security regulations state that "[t]he term younger individual is used to denote an individual 18 through 49." 20 C.F.R., Part 404, Subpart P, Appendix 2, § 201(h)(1).

Kelly graduated from high school in 2004 and can read, write, speak and understand the English language and perform basic mathematical functions. Tr. 226, 247 and 249. During Kelly's elementary and secondary schooling he attended regular education classes. Tr. 249. After graduating from high school Kelly did not complete "any type of specialized job training, trade or vocational school." Id.

Kelly has past relevant employment[6] as (1) a landscape helper which was described as unskilled, heavy work by a vocational expert; (2) a janitor which was described as unskilled, medium work; (3) a lifeguard which was described as semi-skilled, medium work; and (4) a stacker at a lumbar facility which was described as semi-skilled, heavy work.[7] Tr. 121.

---

6. Past relevant employment in the present case means work performed by Kelly during the 15 years prior to the date his claim for disability was adjudicated by the Commissioner. 20 C.F.R. §§ 404.1560 and 404.1565.

7. The terms sedentary, light, medium and heavy work are defined in the regulations of the Social Security Administration as follows:

> (a) *Sedentary work*. Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.
>
> (b) *Light work*. Light work involves lifting no more than 20 pounds at a time with frequent lifting or
>
> (continued...)

Kelly's employment is limited and all of it was located in eastern and northeastern Pennsylvania. Kelly reported that he worked (1) from August, 2005 to July, 2006 for Pocono Mountain School District as a janitor or maintenance person; (2) from May, 2006 to September, 2006 for Strauser Landscaping cutting grass; (3) during 2007 for Towne & Country Landscaping as a landscaper;[8]

---

7. (...continued)
carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

(c) *Medium work.* Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can do sedentary and light work.

(d) *Heavy work.* Heavy work involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. If someone can do heavy work, we determine that he or she can also do medium, light, and sedentary work.

20 C.F.R. §§ 404.1567 and 416.967.

8. The name of the company is gleaned from the records of the Social Security Administration. Kelly reported that he worked as a landscaper during 2007 but mistakenly indicated that it was for "Strauser Nature's Helper." Tr. 208 and 270. The records of the Social Security Administration reveal that Kelly in addition to working for Pocono Mountain School District in 2006 also worked
(continued...)

(4) from February, 2008, to August, 2008 for Great Wolf Lodge as a lifeguard and maintenance person; (5) from May, 2009 to October, 2009, for Mountain Landscaping as a laborer; and (6) from March, 2011 to May, 2011 for "Bestway Enterprises/Lumbar Treatment Plant" as a "stacker operator." Tr. 236, 240, 250 and 270-271. Kelly also worked in 2002 for Lewis Supermarket, Inc., located in Allentown. Tr. 208.

Records of the Social Security Administration reveal that Kelly had earnings in the years 2002, 2005 through 2009 and 2011. Tr. 202. Kelly's highest annual earnings were in 2006 ($11,501.56). Id. Kelly's total earnings were $46,347.79. Id. Kelly testified at the administrative hearing held that he quit working at Bestway Enterprises on September 5, 2011, as result of a motorcycle accident. Tr. 70-71. However, in documents filed with the Social Security Administration Kelly stated that he stopped working at Bestway Enterprises on May 25, 2011, about 3 months before the motorcycle accident. Tr. 249 and 270. He further stated that he was "[l]et go [from Bestway Enterprises] for tardiness." Tr. 248.

Kelly claims that he became disabled on September 5, 2011, as a result of the motorcycle accident in which he sustained multiple injuries. Tr. 184, 191 and 248. He lists the disabling

---

8.  (...continued)
for Strauser Nature Helpers. Id.

conditions as (1) brachial plexus injury to the left arm;[9] (2) bilateral wrist fractures; (3) left foot bone chip fracture; (4) head and neck issues; (4) body trauma; (5) posttraumatic stress syndrome; and (6) post-concussion syndrome. Tr. 248. Kelly is right-handed. Tr. 99 and 228. In a document filed with the Social Security Administration Kelly stated that he has headaches and constant, burning pain in his left arm which runs from his shoulder to the tips of his fingers. Tr. 231.

For the reasons set forth below we will affirm the decision of the Commissioner denying Kelly's applications for disability insurance benefits and supplemental security income benefits.

**Standard of Review**

When considering a social security appeal, we have plenary review of all legal issues decided by the Commissioner. See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin., 181

---

9. "The brachial plexus is the network of nerves that sends signals from your spine to your shoulder, arm and hand. A brachial plexus injury occurs when these nerves are stretched, compressed, or in the most serious cases, ripped apart or torn away from the spinal cord. The most severe brachial plexus injuries usually result from auto or motorcycle accidents. Severe brachial plexus injuries can leave your arm paralyzed, with a loss of function and sensation. Surgical procedures such as nerve grafts, nerve transfers or muscle transfers can help restore function." Brachial plexus injury, Overview, Mayo clinic staff, http://www.mayoclinic.org/diseases-conditions/brachial -plexus-injury/home/ovc-20127336 (Last accessed September 8, 2015).

F.3d 429, 431 (3d Cir. 1999); <u>Krysztoforski v. Chater</u>, 55 F.3d 857, 858 (3d Cir. 1995).  However, our review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence."  <u>Id.</u>; <u>Brown v. Bowen</u>, 845 F.2d 1211, 1213 (3d Cir. 1988); <u>Mason v. Shalala</u>, 994 F.2d 1058, 1064 (3d Cir. 1993). Factual findings which are supported by substantial evidence must be upheld. 42 U.S.C. §405(g); <u>Fargnoli v. Massanari</u>, 247 F.3d 34, 38 (3d Cir. 2001)("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); <u>Cotter v. Harris</u>, 642 F.2d 700, 704 (3d Cir. 1981)("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence.");  <u>Keefe v. Shalala</u>, 71 F.3d 1060, 1062 (2d Cir. 1995); <u>Mastro v. Apfel</u>, 270 F.3d 171, 176 (4th Cir. 2001);  <u>Martin v. Sullivan</u>, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" <u>Pierce v. Underwood</u>, 487 U.S. 552, 565 (1988)(quoting <u>Consolidated Edison Co. v. N.L.R.B.</u>, 305 U.S. 197, 229 (1938)); <u>Johnson v. Commissioner of Social Security</u>, 529 F.3d 198, 200 (3d Cir. 2008);  <u>Hartranft v. Apfel</u>, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence has been described as more

than a mere scintilla of evidence but less than a preponderance. Brown, 845 F.2d at 1213. In an adequately developed factual record substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason, 994 F.2d at 1064. The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Johnson, 529 F.3d at 203; Cotter, 642 F.2d at 706-707. Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole. Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979).

**Sequential Evaluation Process**

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 432(d)(1)(A). Furthermore,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.  For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner utilizes a five-step process in evaluating disability insurance and supplemental security income claims.  <u>See</u> 20 C.F.R. §404.1520 and 20 C.F.R. § 416.920; <u>Poulos</u>, 474 F.3d at 91-92.  This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity,[10] (2) has an impairment that is severe or a combination of impairments that is severe,[11] (3) has

_____

10.  If the claimant is engaging in substantial gainful activity, the claimant is not disabled and the sequential evaluation proceeds no further. Substantial gainful activity is work that "involves doing significant and productive physical or mental duties" and "is done (or intended) for pay or profit."  20 C.F.R. § 404.1510 and 20 C.F.R. § 416.910.

11.  The determination of whether a claimant has any severe
(continued...)

an impairment or combination of impairments that meets or equals

the requirements of a listed impairment,[12] (4) has the residual

functional capacity to return to his or her past work and (5) if

not, whether he or she can perform other work in the national

_____

11. (...continued)
impairments, at step two of the sequential evaluation process, is
a threshold test. 20 C.F.R. §§ 404.1520(c) and 416.920(c). If a
claimant has no impairment or combination of impairments which
significantly limits the claimant's physical or mental abilities
to perform basic work activities, the claimant is "not disabled"
and the evaluation process ends at step two. Id. If a claimant
has any severe impairments, the evaluation process continues. 20
C.F.R. §§ 404.1520(d)-(g) and 416.920(d)-(g). Furthermore, all
medically determinable impairments, severe and non-severe, are
considered in the subsequent steps of the sequential evaluation
process. 20 C.F.R. §§ 404.1523, 404.1545(a)(2), 416.923 and
416.945(a)(2). An impairment significantly limits a claimant's
physical or mental abilities when its effect on the claimant to
perform basic work activities is more than slight or minimal.
Basic work activities include the ability to walk, stand, sit,
lift, carry, push, pull, reach, climb, crawl, and handle. 20
C.F.R. § 404.1545(b). An individual's basic mental or non-
exertional abilities include the ability to understand, carry out
and remember simple instructions, and respond appropriately to
supervision, coworkers and work pressures. 20 C.F.R. § 1545(c).


12. If the claimant has an impairment or combination of
impairments that meets or equals a listed impairment, the
claimant is disabled. If the claimant does not have an impairment
or combination of impairments that meets or equals a listed
impairment, the sequential evaluation process proceeds to the
next step. 20 C.F.R. § 404.1525 explains that the listing of
impairments "describes for each of the major body systems
impairments that [are] consider[ed] to be severe enough to
prevent an individual from doing any gainful activity, regardless
of his or her age, education, or work experience." Section
404.1525 also explains that if an impairment does not meet or
medically equal the criteria of a listing an applicant for
benefits may still be found disabled at a later step in the
sequential evaluation process.

economy. Id.  As part of step four the administrative law judge must determine the claimant's residual functional capacity. Id.[13]

Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule. The residual functional capacity assessment must include a discussion of the individual's abilities. Id; 20 C.F.R. §§ 404.1545 and 416.945; Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

**MEDICAL RECORDS AND OTHER EVIDENCE**

Before we address the administrative law judge's decision and the arguments of counsel, we will briefly review some of Kelly's activities and review in detail Kelly's medical records.

In a "Function Report - Adult" dated November 20, 2011, Kelly stated that he lived alone in a "cottage" and that he had no

---

13.  If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled.

use of his left arm for lifting or holding items. Tr. 223.

Inconsistently, Kelly's mother testified at the administrative

hearing that after the accident in September, 2011, Kelly moved in

with her and her husband. Tr. 104-105.  She further testified that

he did not move out of their home until approximately June 1,

2012. Tr. 105.  Kelly in the Function Report further stated that

he was able to dress, shower, wash his hair, shave, and use the

toilet, although with difficulty; he stated he needed no reminders

to take care of personal needs and grooming or to take his

medicines; he reported he was able to prepare simple meals and use

a vacuum cleaner with one arm; he reported going out 3 times per

week and being able to ride in a car but that he did not drive a

motor vehicle; he reported shopping in stores and by way of a

computer; he stated that he spent time with others and his friends

occasionally picked him up and they also communicated by way of

cellular phones. Tr. 224, 225, 226 and 227.  In the "Function

Report," Kelly when asked to check items which affect his

"illnesses, injuries, or conditions" did <u>not</u> check sitting,

talking, hearing, seeing, memory, concentration, understanding,

following instructions and getting along with others. Tr. 228.

    When asked at the administrative hearing why he could

not work, Kelly stated as follows: "There's no way because the

pain with the one arm, I obviously need two arms to operate the

machines." Tr. 71. When asked about his right arm he stated as follows: "Yeah, I mean it bothers me, but I have use of my right arm." Tr. 74. When specifically asked whether he had full use of his right arm he replied as follows: "Yeah." Id. He also testified that he could lift one of the chairs in the administrative hearing room with his right arm. Tr. 75. Kelly testified that he spends half his day watching television and the other half using his cellular phone to access a Facebook account. Tr. 91-92. He also stated that he reads "some articles" in magazines and newspapers. Id. During the hearing it was also revealed that Kelly was occasionally driving a motor vehicle to the home of his parents and to medical appointments. Tr. 83 and 107. The drive to the office of one of his physicians, Ric A. Baxter, M.D., involves a drive of 40 minutes one-way. Tr. 107.

At the end of November, 2011, Kelly reported to a physical therapist that he could bathe, dress and perform most activities of daily living with his right arm. Tr. 681. In March, 2012, six months after his motorcycle accident, Kelly reported driving using only his right arm. Tr. 755. He was also able to move out of his parents' home and begin living on his own in June 2012, 9 months after the accident. Tr. 105 and 779. In July 2012, Kelly admitted, "I could look after myself without causing extra pain. Tr. 781. At that time, Kelly also reported that despite his

pain, he could manage traveling for over 2 hours, walk "a quarter of a mile," "sit as long as [he would] like," and "stand as long as [he] want[ed]." Tr. 781.

The medical records reveal that on September 5, 2011, Kelly while operating a motorcycle collided with an automobile which pulled out in front of him and was thrown 80 feet. Tr. 285, 294 and 346. One medical record suggests that Kelly was on narcotic pain medications at the time of the accident. Tr. 346. Specifically, Kelly told a consulting physician that he was prescribed OxyContin which he normally takes 4 times per day for hand pain.[14] Id. The impetus for the hand pain was injuries allegedly sustained in a fight. Tr. 346. Another medical record

---

14. "OxyContin (oxycodone) is an opioid pain medication . . . sometimes called a narcotic . . . used to treat moderate to severe paint that is expected to last for an extended period of time." OxyContin, Drugs.com, http://www.drugs.com/oxycontin.html (Last accessed September 13, 2015). "The side effects of oxycodone are related to the organs that are affected by the drug such as the liver, brain and kidneys. Some of the more common side-effects include nausea, constipation, vomiting, headache, itchy skin, insomnia and dizziness. Side effects that are not common can include allergic reaction, chills and fever, migraine headaches, palpitations, anemia, gout or bone pain, edema, agitation, anxiety, confusion, dry mouth, personality disorder, heart failure or gingivitis." Long-Term Effects of Taking Oxycodone, Livestrong.com, http://www.livestrong.com/article /79119-longterm-effects-taking-oxycodone/ (Last accessed September 13, 2015). "The ulnar styloid is a small process (bump) that protrudes at the wrist opposite the thumb and serves as an attachment sit for the ulnar collateral ligament which joints the ulna and two of the carpal bones and facilitates wrist stability." Hand and Wrist Anatomy, Ulnar Styloid, https://www. wristsupportbraces.com/m-25-ulnar-styloid.aspx (Last accessed September 13, 2015).

states that Kelly was "using oxycodone prior to the MVC for neck pain." Tr. 297. Kelly at the time of the motorcycle accident was wearing a helmet and did not suffer a loss of consciousness. Tr. 285, 294 and 346.

After the accident Kelly was initially transported to the Pocono Medical Center for evaluation and treatment, including having x-rays and CT scans performed. Tr. 285. An x-ray of the right wrist performed at the Pocono Medical Center "rais[ed] a concern for" a fracture; an x-ray of the left wrist revealed a fracture of the distal radius and ulnar styloid process;[15] an x-ray of the pelvis revealed "[n]o acute displaced fracture;" a chest x-ray was essentially normal; a CT scan of the abdomen and pelvis revealed "[no] acute visceral injury;" a CT scan of the chest revealed some minor abnormalities; a CT scan of the cervical spine was stated to be unremarkable other than a "mild disc bulge

---

15. There are two lower arm bones, the radius and the ulna. When the arms are at the sides of the body with palms facing forward, the radius is the bone farthest from the center of the body and above the thumb; the ulna is the bone closest to the center of the body and above the little finger. The distal radius is the portion closest to the wrist. The scaphoid bone is one of the eight carpal bones of the wrist on the thumb side. It is located next to the distal radius. See, generally, Relevant Wrist Anatomy, joint-pain-expert.net,http://www.joint-pain-expert.net/wrist-anatomy.html (Last accessed March 14, 2014); Anatomy of the Hand and Wrist, HealthPages.org, http://www.healthpages.org/anatomy-function /anatomy-hand-wrist/ (Last accessed September 13, 2015).

at [the] C3-4 [level] and [the] C4-5 [level];"[16] and a CT scan of the brain revealed "[n]o acute hemorrhage[.]"  Tr. 369-373 and 383-384.

After the initial treatment, x-rays and CT scans at Pocono Mountain Medical Center, Kelly was transferred to Lehigh Valley Hospital for further evaluation. Tr. 294 and 308. After arriving at Lehigh Valley Hospital an MRI of Kelly's left shoulder and neck was performed which revealed "[n]o left brachial plexus posttraumatic abnormality;" x-rays of the left wrist and forearm revealed fractures of the distal radius and ulnar styloid process; an x-ray of the elbow revealed no acute fracture, dislocation or bony abnormality; x-rays of the left ankle revealed no evidence of an acute fracture or dislocation but there was marked soft tissue swelling along the medial malleolus; and an MRI of the cervical spine revealed no evidence of traumatic injury but it was noted that the study was degraded because of movement on the part of Kelly. Tr. 306,  308, 310,  312 and 316.

Kelly was admitted to Lehigh Valley Hospital on September 5, 2011, and remained at that facility until September 8, 2011. While at Lehigh Valley Hospital, Kelly was examined by

16.  The actual finding stated in the report of the CT scan of the C3-4 level was "appears unremarkable" and with respect to the C4-5 level the CT scan revealed a "small left paracentral protrusion." Tr. 373.  It was only in the impression section of the report where the interpreting physician stated that the CT scan revealed "mild disc bulges at C3-4 and C4-5." Id.

physicians and other medical personnel multiple times.  An examination by Yen-Hua Yu, D.O., apparently at the time of admission on September 5, 2011, revealed that Kelly had full range of motion and strength in his right upper extremity and no deformities were observed other than a bruise on the knuckles and abrasions. Tr. 295-297. There were similar findings made with respect to the right lower extremity. Id. With respect to the left upper extremity, Kelly had decreased range of motion and his strength was not assessed because of severe pain and abrasions. Id.  There were no deformities observed other than abrasions. Id. There were similar findings made with respect to the left lower extremity. Id.  However, Kelly had bruising (ecchymosis) and swelling of the left ankle. Id.

A physical examination by Robert Barraco, M.D., on September 6, 2011, was essentially normal other than with respect to Kelly's bilateral upper extremities. Tr. 327-328.  Kelly had decreased range of motion and strength in the bilateral upper extremities but he had full range of motion and strength in the bilateral lower extremities. Tr. 328.  It was noted that Kelly's right hand was swollen but there was no bruising observed. Id. Kelly reported pain in the left forearm and hand and he was unable to lift his left arm without pain. Id.

Based on a request from Kamalesh Shaw, M.D., who evaluated Kelly in conjunction with Dr. Yu on September 5, 2011,

18

Kelly was examined on September 6, 2011, by Wayne Dubov, M.D., a physical medicine and rehabilitation specialist. Tr. 297 and 346-349. When Dr. Dubov reviewed Kelly's systems, Kelly denied any headaches, visual changes, loss of consciousness, neck pain or back pain. Tr. 347. Kelly primarily complained of left upper extremity pain but also complained of some pain in the right upper extremity as well as the bilateral lower extremities. Id. After performing a clinical interview, physical examination and reviewing the CT scans, MRIs and x-rays Dr. Dubov concluded that Kelly's upper extremity pain "appear[ed] to be nonphyiologic with somatization of pain."[17] Tr. 348. Dr. Dubov noted that all of the imaging studies were essentially unremarkable, including the MRI of the left shoulder which was negative for brachial plexopathy. Tr. 346 and 348. Dr. Dubov stated that Kelly had "no clear evidence of a definitive brachial plexus injury, or any definitive evidence of any sort of cervical cord injury to explain [his] symptoms." Tr. 348. Dr. Dubov further noted Kelly's history of opiate abuse and suggested a substance abuse consultation with a psychiatrist. Id. Dr. Dubov advised Kelly that "based on his normal x-rays and MRI, that his recovery should be full[.]" Id.

_____

17. Somatization is defined as "the conversion of mental experiences or states into bodily symptoms." Dorland's Illustrated Medical Dictionary, 1734 (32nd Ed. 2012).

On September 7, 2011, Kelly continued to complain of moderate pain in the left arm, left foot, right wrist and bilateral knees. Tr. 330.  The results of a physical examination performed by Dr. Barraco were essentially normal other than as follows. Kelly had decreased range of motion in the right upper extremity and slightly decreased strength; he had some bruising at the right wrist but no deformities; he had decreased range of motion and strength and was tender in the left upper extremity but there were no deformities; he was able to move the fingers of the left upper extremity and his sensation was intact; and he had decreased range of motion and slightly decreased strength in the bilateral lower extremities. Tr. 331. He also had decreased range of motion of the left ankle and bruising was evident over the foot. Id.

On Thursday, September 8, 2011, the day Kelly was discharged, it was reported that Kelly had "no issues overnight," his pain was tolerable with medications, and he was ambulating well. Tr. 285. The discharge diagnosis was a left distal radius, ulnar styloid fracture and right distal radius fracture which were placed in splints.  Tr. 285, 288 and 345. Secondary diagnoses were an avulsion fracture of the left talus[18] and a left shoulder

18.  The talus is defined as "the highest of the tarsal bones and the one that articulates with the tibia and fibula to form the ankle joint called also ankle bone[.]" Dorland's Illustrated
(continued...)

contusion. Id.  Kelly was prescribed pain medications and instructed to follow-up with an orthopedic specialist at Valley Sports and Arthritis Surgeons (VSAS) in two weeks. Id.  At the follow-up appointment the plan was to perform a physical examination and additional x-rays and transition to a short arm cast. Tr. 350.

On Sunday, September 11, 2011, Kelly visited the emergency department at Pocono Medical Center (as a "walk in") complaining of left arm pain with paresthesias (pins and needles, tingling, burning sensation) and an inability to move his left arm. Tr. 388 and 393.  It was noted that Kelly "arrive[d] ambulatory with [a] steady gait to [the] treatment area" and that he was well-groomed, alert and oriented to person, place and time and appeared in no acute distress although it was also stated that he appeared to be in pain. Tr. 389. Kelly reported that he was treated at Lehigh Valley Hospital and that he was not very happy with the care that he had received at that facility. Tr. 388 and 393.  Kelly was initially examined by Richard Cornish, M.D., an emergency medicine specialist, and then Nicolas Teleo, M.D., a general surgeon, was asked to examine Kelly. Id.  Dr. Cornish ordered x-rays of Kelly's left wrist which revealed a "distal

_____

18.  (...continued)
Medical Dictionary, 1870 (32nd Ed. 2012).

radial fracture with alignment maintained at the area of fracture." Tr. 396.

When Dr. Teleo reviewed Kelly's systems,[19] Kelly, inter alia, denied headaches, weakness, numbness, motor deficits, dizziness, lightheadedness, depression and anxiety. Tr. 394.  The only exception to an entirely negative review of systems was that Kelly stated he had left upper extremity pain with paresthesias. Id. The results of a physical examination performed by Dr. Teleo were essentially normal other than Kelly had decreased motor strength and sensation in the left upper extremity. Tr. 394-395. Dr. Teleo offered to transfer him to Lehigh Valley Hospital for further evaluation but Kelly and his family declined to go back to that facility and requested that they be transferred to St. Luke's Hospital.  Tr. 395.  Dr. Teleo spoke with medical personnel at St. Luke's Hospital "who readily accepted [Kelly] but requested a [cervical]-collar pending further investigation for persistent [symptoms]." Tr. 390.

On September 12, 2011, Kelly was admitted to St. Luke's Hospital for further evaluation and remained hospitalized until September 16, 2011. Tr. 406.  Upon admission additional diagnostic

_____

19.  "The review of systems (or symptoms) is a list of questions, arranged by organ system, designed to uncover dysfunction and disease." A Practical Guide to Clinical Medicine, University of California, School of Medicine, San Diego, http://meded.ucsd.edu/ clinicalmed/ros.htm (Last accessed September 13, 2015).

imaging was performed.  An x-ray of the left foot revealed "no fracture or dislocation," "[n]o lytic or blastic lesions," "[n]o degenerative changes" and the "[s]oft tissues [were] unremarkable;" an x-ray of the left ankle revealed similar findings except extensive soft tissue swelling was noted;  an x-ray of the left wrist revealed a non-displaced fracture of the distal radius and ulnar styloid; an x-ray of the right hand revealed a non-displaced fracture of the distal radius; an x-ray of the chest revealed "[n]o active pulmonary disease;" a CT scan of the cervical spine revealed normal alignment, no subluxation, no fractures, no degenerative changes, normal prevertebral and paraspinal soft tissues, and a normal thoracic outlet.  Tr. 441, 443, 444, 446 and 448.

On September 12, 2011, Kelly was also examined by Patrick J. Brogle, M.D. Tr. 429-431.  After performing a clinical interview and physical examination, Dr. Brogle's assessment was that Kelly suffered from bilateral distal radius fractures and the left upper extremity was "suspicious for a [] subacute carpal tunnel syndrome on the left wrist." Tr. 431. Dr. Brogle advised Kelly that he should continue wearing upper extremity splints and a loose ace bandage, and the CAM walker for relief of his left ankle symptoms. Id.

On September 13, 2011, Kelly was examined by David D. Skillinge, D.O. Tr. 426-428.  The results of a physical

examination were essentially normal other than with respect to Kelly's left upper extremity. Tr. 427. Dr. Skillinge noted that Kelly had severe pain to light touch of the left arm beginning at the mid-humerus (upper arm bone) and extending into the fingers. Id. Dr. Skillinge reviewed the diagnostic imaging and noted that the x-rays of the left foot revealed no obvious fractures or dislocations and that the CT scan of the cervical spine showed no acute fractures or malalignment. Id. He further stated that the x-rays of the left wrist confirmed a non-displaced fracture of the distal radius as well as the ulnar styloid fracture and the x-ray of the right wrist revealed a fracture of the distal radius. Id. After performing the physical examination and reviewing the diagnostic imaging, Dr. Skillinge's assessment was that Kelly should undergo operative repair of his left wrist fracture. Tr. 426. He further stated that Kelly as a result of the motorcycle accident suffered from "severe left arm neuropathy" with treatment so far resulting in "suboptimal control." Tr. 428. Dr. Skillinge stated that Kelly would likely benefit from being prescribed additional medications, including neuropathic agents such as tricyclic antidepressants. Id.

On September 13, 2011, Kelly underwent without any complications left wrist surgery performed by Steven T. Puccio, D.O., involving an open reduction and internal fixation of the left distal radius utilizing metallic hardware, and a left carpal

24

tunnel release. Tr. 432-434.  After the surgery it was reported that Kelly continued to have refractory pain. Tr. 407. Pain management was consulted and they were able to structure a regimen that seemed to manage Kelly's pain and it was noted that Kelly would be followed by pain management as an outpatient. Id. Furthermore, Kelly stated he was unable to move his left arm, Kelly was diagnosed with a brachial plexus injury and he was advised to follow-up with neurosurgery on an outpatient basis. Id. At the time of discharge on September 16, 2011, Kelly was also advised to follow-up with Dr. Puccio on September 26, 2011, at the orthopedic clinic. Tr. 406.

On September 26, 2011, a physical examination of Kelly performed by Dr. Puccio revealed that the surgical incisions were well healed; there were no signs of erythema, warmth or drainage; Kelly had persistent symptoms consistent with a brachial plexus injury of the left upper extremity; he was neurovascularly stable in the right upper extremity; he had tenderness near the right distal radius; he had some swelling of the left foot but minimal tenderness to palpation; and the range of motion of his ankle was full, intact and pain free. Tr. 529.  X-rays of the left wrist revealed "[s]table alignment status post [open reduction, internal fixation] of the distal left radius fracture" and the "[u]lnar styloid fracture appear[ed] stable."  Tr. 539. X-rays of the right wrist revealed a stable distal radius fracture and intact soft

tissues. Tr. 538. Dr. Puccio advised Kelly to continue to use the Cam Walker Boot for the left foot; he placed Kelly's right wrist in a cast which would be removed in 4 weeks; Kelly was placed in a universal wrist splint for the left wrist; he was given a prescription for physical therapy; he was prescribed the pain medication oxycodone; and he was advised to follow-up with Dr. Baxter for pain control. Tr. 529. Dr. Puccio scheduled a follow-up appointment in 4 weeks. Id.

On September 29, 2011, Kelly had an appointment with Dr. Baxter at St. Luke's Palliative Care regarding his left upper extremity. Tr. 626-627. Dr. Baxter's notes are partially illegible. However, the court can discern that Dr. Baxter reported Kelly's subjective complaints of pain and reviewed Kelly's pain medications. Tr. 626. Kelly reported a history of opioid use and that he was on oxycodone prior to the accident. Id. Kelly further stated that he had constant 5/10 pain from the mid humerus into the fingertips with frequent flares to 10/10. Id. The results of a physical examination reported by Dr. Baxter were essentially normal other than with respect to Kelly's left upper extremity. Tr. 627. Dr. Baxter gives no indication as to Kelly work-related functional abilities. Id.

Kelly attended physical therapy from October 2011 through July 2012, but missed many appointments with several gaps in treatment, despite being told by his physical therapist that it

was extremely important for his recovery. Tr. 554. The physical therapist noted that despite Kelly's frequent cancellations and no shows his left shoulder nonetheless had improved strength and range of motion. Tr. 734-735, 738, 740-741 and 743. Kelly reported that his medications provided relief "all of the time." Tr. 778.

On October 20, 2011, Kelly visited the emergency department of St. Luke's Hospital complaining that his "head feels weird tonight" and that he was laying in bed when he developed scalp numbness and a tingling sensation which also radiated down the right side of his neck and jaw. Tr. 512. He also reported "some involuntary jerking movement of the left upper extremity." Id. The results of a physical examination were essentially normal other than with respect to his left upper extremity and the right shoulder. Tr. 513. Kelly had decreased range of motion, reflexes strength and sensation in the left upper extremity as well as occasional twitching which was observed. Id. Kelly had a cast on the right arm and it was noted he had decreased range of motion at the shoulder on the right. Id. Kelly had full range of motion and +4/5 strength of the bilateral lower extremities. Id. Kelly was wearing a CAM boot on the left lower extremity. Id. The diagnostic assessment was that Kelly suffered from an anxiety reaction and left brachial plexus radiculitis. Id. Kelly was prescribed the anxiety medication Xanax and discharged from the hospital in a stable condition. Tr. 514.

On October 22, 2011, Kelly returned to the emergency department at St. Luke's Hospital complaining "that his head [was] numb and face [was] numb and [had] pressure in his head" and "whenever he moves his fingers it causes pain in his head." Tr. 518. He further stated that he had numbness "down the left arm constantly, occasionally in the left chest and face." Tr. 519. The results of a physical examination were essentially normal other than with respect to his left upper extremity. Tr. 520. Kelly appeared anxious but in no acute distress. Id. He had weakness and decreased sensation in the left upper extremity but "[s]ymmetric sensation to the face, chest, backs and legs." Id. It was reported that he had no sensory deficits and no extremity tenderness or edema. Id. A CT scan of Kelly's brain was performed which revealed "[n]o acute intracranial hemorrhage, mass effect or edema." Tr. 524. The diagnostic assessment was "post-concussive syndrome, doubt delay [intracerebral hemorrhage];" brachial plexus radiculitis; headache, not otherwise specified; and contusion of the coccyx (tailbone).[20] Tr. 521. Kelly was discharged from the hospital on the same day in a stable condition with instructions

_____

20. There is no explanation for this last diagnosis in the treatment notes of this visit. There is no indication in those notes that Kelly complained about pain or other symptoms associated with his tailbone. There is one reference in the medical record by a nurse who initially assessed Kelly upon arrival at the emergency department that he complained about a "stiff lower back." Tr. 518.

to follow-up with his primary care physician in 3 to 5 days or immediately if his symptoms worsened. Id. It was stated that at the time of discharge Kelly's gait was steady. Id.

On October 24, 2011, Kelly had a follow-up appointment with Dr. Puccio regarding his left and right wrists and his left ankle. Tr. 528. Kelly reported that he was doing well.[21] Id. The cast on Kelly's right wrist was removed. Id. A physical examination revealed that Kelly's right wrist was stiff but he was "motor, sensory and neurovascularly stable." Id. Kelly's left wrist was "nontender about the fracture site; he had full range of motion of his elbow; he reported pain with motion of his left shoulder and there was atrophy "about his shoulder joint;" and there was still swelling noted about the dorsal aspect of Kelly's left foot but there was no tenderness and his range of motion was intact. Id. X-rays were performed on October 24, 2011, which Dr. Puccio reviewed and noted as follows: (1) x-rays images of the left and right wrists revealed well-healed fractures; (2) x-ray images of the left foot and left elbow did not reveal any acute changes; and (3) x-rays of the left shoulder revealed "some inferior subluxation of the humerus [] consistent with his

_____

21. Medical progress notes are divided into four sections: subjective, objective, assessment and plan (SOAP). The subjective portion of a medical treatment note is where a patient's statements and complaints are reported. Under the subjective portion of Dr. Puccio's medical notes it states as follows: "He is doing well." Tr. 528.

brachial plexus injury." Id.  Dr. Puccio's diagnostic assessment
was as follows: "Status post [open reduction, internal fixation]
left distal radius, closed reduction right radial styloid, left
foot sprain and left brachial plexus injury." Id.  Dr. Puccio
advised Kelly to continue with physical therapy for his left arm,
right wrist and left foot. Id.  Dr. Puccio also noted that Kelly
could be "weightbearing to tolerance" and could wean himself from
the CAM walker boot. Id.

Also, on October 24, 2011, Kelly underwent an
electromyography (EMG) of the left upper extremity which revealed
"electrophysiologic evidence of severe axonal upper and middle
trunk brachial plexopathy as evidence by the abnormal nerve
conduction studies and needle findings . . . In addition, there is
evidence of mild median compression neuropathy at the wrist
(carpal tunnel syndrome) with demyelinative changes as evidenced
by the abnormal median mixed palmar studies." Tr. 544.

On October 28, 2011, Kelly again visited the emergency
department at St. Luke's Hospital with "multiple complaints"
similar to those made on October 20 and 22, 2011.  Tr. 580-584. In
addition to the previous complaints Kelly complained of blurred
and double vision[22] and "left arm swelling since physical therapy
yesterday." Tr. 580. Kelly also complained of right ankle swelling

_____

22.  On October 22, 2011, Kelly denied any visual symptoms. Tr.
578.

"without calf pain, erythema, or other pain." Id. Kelly's mother accompanied him on this visit and reported that Kelly was "out of oxycodone and does not have another pain [management] appointment until Nov. 1." Id. When an attending physician reviewed Kelly's systems, Kelly denied any fever, chills, pruritis, rash, back pain, neck pain and black outs. Tr. 582-583. He reported swelling, headaches and left arm pain. Tr. 583. A physical examination revealed the following adverse findings: Kelly appeared anxious and in moderate distress; he had decreased sensation to light touch localized to the left upper extremity; he had mild non-pitting edema in the left upper extremity and right ankle; and he had "[s]ubjective sensory loss to [the left upper extremity] worse on [the] lateral aspect of the thumb." Id. In all other respects the results of the examination were essentially normal, including that Kelly had "[f]ull range of motion in all extremities." Id. Kelly was given two tablets of Percocet (oxycodone-acetaminophen)and discharged from the hospital in an improved condition. Id. Also, during this visit because of the edema in Kelly's left upper extremity and right ankle he underwent an upper and lower limb venous duplex scan to rule out thrombus (blood clot) formation. Tr. 585-587. These scans were negative although the scan of the left upper extremity was limited "secondary to patient's pain and inability to position arm to visualize the left basillic vein in the forearm." Id.

On November 1, 2011, Kelly had an appointment at St. Luke's Hospital with Michael Mosley, M.D. Tr. 629. The medical notes of this appointment are handwritten and only partially legible. It appears that Kelly complained of suffering panic attacks, pain in his left upper extremity and a "'popping' and 'shaking' sensation on the top of his head." Id. Dr. Mosley's objective findings are limited and mostly illegible. Id. He did note that Kelly was tearful and had poor insight and an anxious affect. Id. Dr. Mosley's assessment was that Kelly suffered from left arm brachial plexopathy caused by the motorcycle accident; left arm pain secondary to the brachial plexopathy; posttraumatic stress disorder with severe anxiety secondary to the accident; and "opioid induced constipation, good control." Id. Dr. Mosley under the plan section of his medical notes states that he had a long discussion with Kelly and his family regarding posttraumatic stress disorder and how the related stress and anxiety are contributing to Kelly's pain. Id. Dr. Mosley prescribed the psychotropic medications Klonopin,[23] Effexor[24] and Seroquel[25] and

_____

23. Klonopin "is in a group of drugs called benzodiazepines . . . [I]t affects chemical in the brain that may become unbalanced and cause anxiety. Klonopin is used to treat seizure disorders and panic disorder." Klonopin, Drugs.com, http://www.drugs.com/klonopin.html (Last accessed September 13, 2015).

24. Effexor "is an antidepressant in a group of drugs called selective serotonin and norepinephrine reuptake inhibitors[.] [It] affects chemicals in the brain that become unbalanced and

(continued...)

apparently decreased Kelly dosage of amitriptyline (Elavil), an antidepressant medication.[26] Id.  Dr. Mosley scheduled a follow-up appointment in 2 weeks. Id.  Also, on November 1, 2011, Kelly underwent an MRI of the brain which revealed no intracranial abnormalities which was consistent with a prior CT scan. Tr. 675.

On November 4, 2011, Kelly visited the emergency department at Pocono Medical Center complaining of left arm pain. Tr. 399.  He arrived at about 7:15 p.m. (19:15). Id.  Kelly was observed to be pale, sweaty and anxious upon arrival at the emergency room but was ambulating independently. Id. Kelly stated that "something [was] wrong with his left arm - feels like its grinding[.]" Id. He further noted that he had pain around the thumb. Id.  When Kelly's left upper extremity was examined by a nurse no abnormalities were reported other than subjective complaints of pain by Kelly. Tr. 400.  With respect to the right

---

24.  (...continued)
cause depression. Effexor is used to treat major depressive disorder, anxiety and panic disorder." Effexor, Drugs.com, http://www.drugs.com/effexor.html (Last accessed September 13, 2015).

25.  Seroquel "is an antipsychotic medicine[] [which] works by changing the actions of chemical in the brain. [It] is used to treat schizophrenia [] [and] [] bipolar disorder [] [and] also used together with antidrepressant medications to treat major depressive disorder[.]" Seroquel, Drugs.com, http://www.drugs.com/seroquel.html (Last accessed September 13, 2015).

26.  Amitriptyline, Drugs.com, http://www.drugs.com/amitriptyline.html (Last accessed September 13, 2015).

upper extremity, Kelly had no complaints of pain; he had normal radial and brachial pulses; he had brisk capillary refill; his sensation was intact;, he had no numbness or tingling; and he had full range of motion. Id. Kelly was placed in a room on a bed with a call bell. Tr. 401. At about 7:46 p.m. (19:46) Kelly was ringing the call bell and when checked on, Kelly stated that he was spitting out pieces of his teeth. Id. An examination of Kelly's mouth revealed that all of his teeth were intact, there were no chips, no missing teeth and all fillings were in place. Id. Kelly then stated that he could not breathe and was dying and commenced hyperventilating. Id. It was noted that Kelly's mother was present but at some point after this encounter Kelly "eloped" from the emergency department and could not be found. Id. The case was closed by the attending physician and the mother advised that Kelly would be retriaged and registered when he was brought back to the emergency department.[27] Id.

The next day, November 5, 2011, Kelly visited the emergency department at St. Luke's Hospital with multiple complaints similar to those he had on previous occasions when he visited the emergency department at St. Luke's Hospital.[28] Tr.

_____

27. There is also an indication that the mother was going to attempt to involuntary commit (302) Kelly for psychiatric treatment. Tr. 400-401.

28. There is no indication that Kelly's mother took any steps to
(continued...)

34

592. Kelly stated that he felt that his left hand was "not right" and that he had paresthesias intermittently prior to this visit. Id. Kelly denied "any increased pain" and apparently was of the opinion that the antidepressants which he was started on were responsible for his symptoms and he discontinued taking them. Id. Kelly denied suffering from any fever, chills, weight loss, fatigue, headaches neck pain or any recent trauma and he had no other complaints. Id. The results of a physical examination were essentially normal other than decreased strength in his left upper extremity and increased pain with range of motion of the arm. Id. Kelly was alert and oriented to person, place and time; his left hand grasp was 5/5; his sensation over the left hand and arm was intact; and the motor and neurological examination in all the other extremities was normal. Id. After performing multiple diagnostic tests, Kelly was discharged from the hospital in a stable condition. Tr. 589 and 596.

On November 9, 2011, Kelly underwent x-rays of his left forearm and hand which revealed "[s]table postoperative alignment of [the] distal radius" and "[n]o acute abnormality[.]" Tr. 573-574.

On November 10, 2011, Kelly visited the emergency department at St. Luke's Hospital with complaints of "hand burning

---

28. (...continued)
involuntarily commit him to a psychiatric facility.

and foot numbness" which "symptoms [were] anatomically localized to the left thumb and left plantar foot surface." Tr. 613. Kelly also complained of "head burning/numbness." Id. The results of a physical examination were essentially normal. Tr. 614. It was reported that Kelly had "[n]o extremity edema,"[29] "[n]o motor deficits" and "[n]o sensory deficits." Id. The attending physician ordered a CT scan of the head because of the complaints regarding head numbness and burning. Tr. 618. However, Kelly left the emergency department against medical advice without having the CT scan performed. Id. Kelly arrived at the hospital by private transportation and left with his family. Tr. 615 and 618.

On November 14, 2011, Kelly had an appointment with two physicians. First, he had an appointment with Darshan B. Patal, M.D., a family practitioner in Mountainhome, Pennsylvania, and then with Dr. Baxter. Tr. 630-631 and 666-672. At the appointment with Dr. Patal, Kelly complained of erectile dysfunction and requested something for it. Tr. 666. Kelly told Dr. Patal that he stopped all of his psychotropic medications 1 week prior to the appointment and that he no longer had acute panic attacks or emergency room visits for suicidal thoughts. Id. Kelly stated that he was "feeling better." Id. When Dr. Patal reviewed Kelly's systems, he denied headaches, visual changes, dizziness, neck

_____

29. The edema observed on October 28th had disappeared. Tr. 580-584.

swelling, chest pain, shortness of breath, abdominal pain, urinary symptoms, rashes or edema. Id. Kelly reported a left shoulder deformity and inner left knee pain. Id. The objective physical examination findings reported by Dr. Patal were all normal other than Kelly's blood pressure was elevated (140/98). Tr. 667. Dr. Patal stated that Kelly was alert, comfortable, cooperative, healthy, in no distress, well developed, and well nourished. Id.

Dr. Baxter's treatment notes are barely legible but reveal that Kelly was examined without his mother present. Tr. 630. Kelly reported that he stopped taking Effexor, Klonopin, amitriptyline and Seroquel and stated that he now feels "normal." Id. Kelly also reported that he suffered a fall recently and complained of a left shoulder "separation." Id. Dr. Baxter noted that Kelly wanted to stop taking morphine but that the gabapentin (Neurontin)[30] was helpful. Id. Dr. Baxter advised Kelly of the need for physical therapy/rehabilitation and Kelly stated that he agreed with that advice. Id. Dr. Baxter reviewed the diagnostic studies, including x-rays and noted that they were all normal after the wrist surgery. Id. The physical and mental status examinations performed by Dr. Baxter revealed that Kelly was alert, awake and oriented to person, place and time; he had better

---

30. Gabapentin "is an anti-epileptic medication, also called an anticonvulsant. . . [It] is used in adults to treat nerve pain[.]" Gabapentin, Drugs.com, http://www.drugs.com/ gabapentin.html (Last accessed September 13, 2015).

eye contact and no obvious thought disorders or hallucinations; his breathing was even and unlabored; his left shoulder had a ½ inch step off at the acromioclavicular joint but with no subluxation and Kelly had adequate passive range of motion; Kelly's left hand and forearm were unchanged; and he had no edema. Tr. 631. Dr. Baxter's diagnostic assessment was that Kelly suffered from pain in the left arm and hand due to traumatic brachial plexopathy; intractable neuralgia;[31] a left shoulder separation; posttraumatic stress disorder with panic disorder; and he questioned whether Kelly suffered from opioid induced neurotoxicity. Id. Dr. Baxter prescribed methadone in place of morphine and Kelly was continued on gabapentin at an increased level. Id.

On November 30, 2011, x-rays of Kelly's left shoulder revealed "[f]indings suspicious for [an] impacted humeral head fracture, not seen on previous examination." Tr. 676. There were no lesions or degenerative changes and the soft tissues were unremarkable. Id. X-rays of Kelly's left knee on the same day revealed an "[i]ntra-articular loose body/avulsion fracture within the region of the tibial spine/intercondylar notch." Tr. 677. There were no lesions or degenerative changes, the soft tissues

_____

31. Neuralgia is defined as recurring "pain which extends along the course of one or more nerves. Many varieties of neuralgia are distinguished according to the part affected[.]" Dorland's Illustrated Medical Dictionary, 1126 (27th Ed. 1988).

were unremarkable and there was no joint effusion. Id. An MRI of Kelly's left shoulder revealed the following: "There is diffuse intramuscular edema in the rotator cuff muscles, without tendon tear. There is also muscle edema within the deltoid. Given history of brachial plexus injury, this is probably denervation injury. There is no evidence of a humeral head fracture as was suspected on [the] [] plain [x-ray] films." Tr. 679.

Also, on November 30, 2011, Kelly told a physical therapist that his primary concern was his left shoulder because he had little functional use; that his left foot and ankle were back to normal; his right shoulder was stiff and weak but not painful; his neck only bothered him intermittently; and he no longer had neck spasms or headaches. Tr. 681.

On December 5, 2011, Kelly had a follow-up appointment with Dr. Puccio regarding his left wrist fracture which was surgically repaired. Tr. 727. Kelly reported that he was "doing quite well at the present time with regard to his overall mental state." Id. Dr. Puccio when physically examining Kelly's left wrist observed a "significant loss of supination[32] to the point where he does get to neutral and causes him significant

--------

32. If you hold the arms straight and level at your side with the fingers extended and the thumb pointed upward, supination is turning the arms so that the palms are facing upward. Pronation is the opposite of supination, the palms are turned downward.

discomfort." Id. Dr. Puccio had x-rays taken of the left wrist and reported that they revealed "a well-healed fracture" and "satisfactory alignment." Id. The x-rays further revealed "evidence of disuse osteoporosis in the distal radius and the carpal bones" but "otherwise [the x-rays] were unremarkable." Id. Dr. Puccio further noted that Kelly was still suffering from brachial plexopathy and that Kelly was scheduled to see a surgeon "at the University of Pennsylvania for consideration of possible sural nerve graft." Id. Dr. Puccio scheduled a four to six week follow-up appointment and stated that if Kelly was still having symptoms with regard to pronation and supination, arrangements [would] be made for [him] to undergo an evaluation by . . . [a] hand surgeon." Id.

On December 6, 2011, Kelly was evaluated by Eric L. Zager, M.D., a neursurgeon at the Hospital of the University of Pennsylvania located in Philadelphia. Tr 701-702. Kelly was accompanied by his parents and sister to the appointment. Tr. 701. A physical examination revealed severe limitation of Kelly's left upper extremity involving subluxation of the shoulder joint and atrophy of the shoulder muscles, and no strength (0/5) in five muscles (supraspinatus, infraspinatus, deltoid, biceps and brachioradialis) which are involved in the stability of the shoulder joint and movement of the left upper extremity including raising and rotating the arm. Id. Dr. Zager found that Kelly's

left hand muscles were functional and that he had patchy sensation in the upper arm with good sensation in the forearm and hand but absent in the thumb. Id. Dr. Zager noted that Kelly's other extremities, the right upper and bilateral lower were strong and did not report any functional limitations with respect to them. Id. After performing a clinical interview, the physical examination and reviewing the results of the EMG performed on October 24, 2011, Dr. Zager concluded that Kelly "suffered a severe injury of the supraclavicular plexus" and recommended exploratory surgery of the left brachial plexus with the possibility of then performing a nerve graft or nerve transfer reconstruction in an attempt to restore shoulder abduction[33] and elbow flexion. Id.

A physical therapy discharge summary dated December 9, 2011, reveals that Kelly opted for the surgery because the discharge summary states as follows: "[Kelly] [is] having surgery on brachial plexus and will be hospitalized. [Kelly] will need new [prescription] for [initial evaluation] and treat[ment] to return." Tr. 749.

On December 12, 2011, Kelly had a follow-up appointment with Dr. Baxter regarding his left upper extremity pain. Tr. 715.

_____

33. Adduction is movement toward or beyond the midline of the body in the frontal plane; abduction is movement of a body part away from the midline of the body. See Dorland's Illustrated Medical Dictionary, 2 & 26 (32nd Ed. 2012).

Dr. Baxter reported that Kelly was tolerating methadone and gabapentin, "feel[ing] mentally clearer," his "bowels [were] ok," and he "acknowledge[d] frustration [with the] situation." Id. Dr. Baxter noted that Kelly was scheduled for surgery at the Hospital of the University of Pennsylvania. Id. With respect to the objective findings, Dr. Baxter noted that Kelly was alert, awake and oriented to person, place and time; he had good eye contact; his mood and affect were appropriate; his breathing was even and unlabored; he had a regular rate and rhythm of the heart; his abdomen was soft and nontender with normal bowel sounds; and he had hyperalgesia[34] and allodynia[35] of the forearm and fingers of the left upper extremity. Id. Dr. Baxter's assessment was left upper extremity pain caused by brachial plexopathy, intractable neuralgia and posttraumatic stress disorder. Id. Dr. Baxter continued Kelly on gabapentin, oxycodone and an increased dose of methadone. Id.

On December 16, 2011, Kurt Maas, M.D., reviewed on behalf of the Bureau of Disability Determination Kelly's medical records, including Dr. Baxter's treatment note of December 12,

---

34. Hyperalgesia is defined as an abnormally increased pain sense. Dorland's Illustrated Medical Dictionary, 886 (32nd Ed. 2012).

35. Allodynia is defined as "pain resulting from a non-noxious stimulus to normal skin." Dorland's Illustrated Medical Dictionary, 51 (32nd Ed. 2012).

2011, and concluded that Kelly suffered from a brachial plexus injury to the left upper extremity but could perform light work that involved limited use of his left arm, no climbing or crawling and had to avoid concentrated exposure to extreme cold, vibration and hazardous machinery and heights. Tr. 133, 135-136 and 138-140. Dr. Maas further opined that Kelly had no manipulative, communicative or visual limitations. Id. Also, James Vizza, Psy.D., a state agency psychologist reviewed Kelly's medical records and on January 3, 2012, opined that Kelly had no severe mental impairments. Tr. 137-138.

On December 30, 2011, Kelly had a follow-up appointment with Dr. Baxter at which time Kelly reported suffering from increased "nerve pain" and his left arm and hand throbs, aches, burns and gets cold easily and this increased pain was causing an increase in his anxiety. Tr. 714. Dr. Baxter discussed the following possible options with Kelly: (1) increase the dosage of methadone; (2) add a prescription for amitryptiline; and (3) wear a compression sleave for the hand pain. Id. Apparently, Kelly requested an increase in his dosage of oxycodone because Dr. Baxter explained several times the problem with using an increased dosage and "the development of tolerance." Id. The objective examination findings were as follows: (1) Kelly was alert, awake and oriented to person, place and time; (2) he appeared anxious and had difficulty focusing; (3) his breathing was even and

unlabored; (4) he had a regular heart rate and rhythm; (5) his abdomen was soft and nontender; and (6) his hand was in a sling. Id. Dr. Baxter's assessment remained the same except instead of listing posttraumatic stress disorder as a diagnoses, he listed anxiety.[36] Id.

On January 5, 2012, Kelly was admitted to the Hospital of the University of Pennsylvania to undergo surgery on his left shoulder. Tr. 694. Dr. Zager performed an exploration and decompression of the left brachial plexus site with nerve grafts and transfers. Tr. 694-695. Kelly "tolerated the procedure well and had his pain controll[ed] within 1 to 2 days[.]" Tr. 694. He tolerated a regular diet and was ambulating. Id. After being seen by physical therapy he was deemed suitable for discharge on January 7, 2012. Id.

On January 10, 2012, it appears that a certified registered nurse practitioner at the Hospital of the University of Pennsylvania phoned Dr. Baxter's office indicating that Kelly did well "postop" but was now suffering from "lots of pain." Tr. 713. The nurse noted that Kelly had been taken off of gabapentin and

---

36. Dr. Baxter is a family practicer and pain management specialist. He is not a psychiatrist. Furthermore, although he is board certified in family medicine there is no indication that he is certified by any organization as a pain management specialist.

started on Lyrica.[37] Id. Dr. Baxter recommended a gradual restart of gabapentin, an increased dosage of amitriptyline and a prescription for methadone. Id. Dr. Baxter also scheduled a follow-up appointment.[38] Id.

On January 24, 2012, Kelly apparently had an appointment with Dr. Mosley, a physician associated with Dr. Baxter. Tr. 712. The notes of this appointment are mostly illegible. Id. The court can discern that Kelly reported that his pain was worse since the surgery. Id. The notes also mentioned that Kelly received a week supply of pain medication from a nurse and had a follow-up appointment in 4-6 weeks and Kelly apparently ran out of his oxycodone and attested he would not get anymore pain medication from them (the court assumes this is referring to the nurse at the Hospital of the University of Pennsylvania) in the future. Id. The objective findings are only partially legible but there is no indication that Kelly had any functional deficits with respect to his right upper extremity or his bilateral lower extremities. Id.

_____

37. Lyrica (generic name pregabalin) "is an anti-epileptic drug, also called an anticonvulsant. . . Lyrica is used to control seizures and to treat fibromylagia. It is also used to treat pain caused by nerve damage in people with diabetes (diabetic neuropathy) . . . or neuropathic pain associated with spinal cord injury." Lyrica, Drugs.com, http://www.drugs.com/lyrica.html (Last accessed September 13, 2015).

38. The handwriting of Dr. Baxter and an associate of his, Dr. Mosley, is barely legible and at time illegible.

On January 31, 2012, Kelly underwent an initial physical therapy evaluation at Good Shepherd Outpatient Rehabilitation. Tr. 746-748. The physical therapist conducting the evaluation stated that Kelly had "no functional use of [his] [left upper extremity] at this time due to complete immobilization in [a] sling" and that he "sleeps and showers [with] arm immobilized." Tr. 747. It was also noted that Kelly had "significant forward head posture and rounded shoulders" and his left arm was in a sling all the time but he was right hand dominant. Id. The physical therapist recommended occupational therapy to address Kelly's left hand and wrist. Tr. 748. There was no mention of any need to address a functional deficit of Kelly's right upper extremity or his bilateral lower extremities. Id. The physical therapist recommended 2 to 3 therapy sessions per week for 10 to 12 weeks and noted that his rehabilitation potential was fair to good. Id.

On February 7, 2012, Kelly had another appointment with Dr. Mosely at which Kelly complained of worsening pain since starting physical therapy. Tr. 711. The objective findings and assessment of Dr. Mosley all related to Kelly's left upper extremity. Id. There was no indication that Kelly had any physical, functional limitations with respect to his right upper extremity or his bilateral lower extremities. Id.

On February 15, 2012, Kelly had a follow-up appointment with Dr. Zager at which Dr. Zager observed that Kelly's incisions

were all healing well without evidence of infection; and there had been "no neurological change, specifically no shortness of breath, loss of function in the triceps or hand." Id. Kelly reported that he was still bothered by constant neuropathic pain following the surgery but Dr. Zager indicated that "[h]e has a pain management specialist who is working with his medication" and that he discussed with Kelly and his mother the possibility of another surgical operation to address his pain which they indicated they would consider. Id. Dr. Zager advised Kelly to remove his sling and pursue range of motion exercises with his physical therapist. Id. With regard to the physical therapy, Kelly complained that it was uncomfortable but Dr. Zager emphasized the importance of maintaining the range of motion that is already limited in the shoulder, wrist and hand of the left upper extremity. Id.

On February 20, 2012, Kelly had an appointment with Dr. Baxter at which he stated he was attending physical therapy which resulted in an increase in his pain in the left upper extremity which apparently required him to take oxycodone more frequently. Tr. 710. None of the objective findings reported by Dr. Baxter related to the right upper extremity or the bilateral lower extremities. Tr. 709. Dr. Baxter's assessment remained the same although he noted that Kelly's "anxiety/PTSD" was "stable." Id.

At a physical therapy appointment on March 8, 2012, Kelly reported "noticing a little more strength and motion [at the

left] shoulder but still [complained] of persistent pain." Tr.
743.  The physical therapist stated that Kelly had "continued
hypersensitivity throughout the [left upper extremity]" but was
"progressing very well [with] desensitization techniques" and
Kelly had "progressed [with] grip strength to allow grasping some
objects, however, [he had] minimal functional motion [at the]
shoulder, elbow and wrist." Tr. 743-744.  The physical therapist
further stated that Kelly "demonstrate[d] progress [with] [passive
range of motion], strength, and sensitivity, since beginning
therapy" but "[p]rogress [had] been limited [due] to poor
attendance [and] transportation issues." Tr. 744.  The physical
therapist concluded that Kelly was "a good candidate for
outpatient physical therapy to address [the] deficits and optimize
function of the [left upper extremity]." Id.  The physical
therapist did not report any functional deficits relating to the
right upper extremity or the bilateral lower extremities. Id.

Kelly had appointments with Dr. Baxter on March 16,
April 13, May 11, June 4 and 19, July 2, August 6, October 4,
November 1 and 27, 2012. Tr. 703-708, 785, 788 and 794-795. Dr.
Baxter continued to report functional deficits in Kelly's left
upper extremity with subjective complaints of pain but he did not
report any functional deficits in Kelly's right upper extremity or
bilateral lower extremities. Id.  Dr. Baxter's diagnostic
assessment remained essentially the same during this period of

time: intractable left upper extremity pain with lack of function. Id.

On May 21, 2012, Kelly had a follow-up appointment with Dr. Puccio regarding his left wrist. Tr. 726. An x-ray of the left elbow revealed "significant post traumatic and disuse osteoporosis and osteopenia as well as posteriorly subluxed radial head" and "loss of pronation as well as supination of the left hand." Tr. 726. Dr. Puccio noted that Kelly had "a significant[] traumatic injury to the left upper extremity which may not have great potential recovery." Id. Dr. Puccio did not report on the right upper extremity or the bilateral lower extremities. Id.

On June 25, 2012, Kelly had an appointment with Dr. Zager for reevaluation of his left upper extremity. Tr. 698-699. At this appointment Kelly complained of some swelling in the left upper and lower extremities. Tr. 698. Dr. Zager noted that Kelly had an ultrasound examination of the left upper extremity which revealed no evidence of deep vein thrombosis but that the lower extremity edema should be evaluated by his primary care physician.[39] Tr. 698. Dr. Zager noted that Kelly's neuropathic pain was being managed by a local pain management specialist and suggested that Kelly discuss with him the possibility of "a trial of spinal cord stimulation." Id.

_____

39. A review of the subsequent medical records reveals no report of left lower extremity edema.

On July 9, 2012, Kelly had a follow-up appointment with Dr. Puccio regarding his left upper extremity pain. Tr. 725. There were no objective examination findings reported by Dr. Puccio. Id. Dr. Puccio also suggested that Kelly may be a candidate for a spinal cord stimulator. Id.

Also, on July 9, 2012, Kelly had an appointment with Vinti Shah, D.O., a pain management specialist at St. Luke's Hospital. Tr. 783-784. Kelly told Dr. Shah that he was not sure if he wanted to go forward with the use of a spinal cord stimulator and that he needed to think about it. Tr. 783. When Dr. Shah reviewed Kelly's systems, all systems were negative other than with regard to the functional limitations and pain in the left upper extremity. Id. The results of a physical examination were essentially normal other than with regard to the left upper extremity. Tr. 784. Kelly appeared to be in no acute distress; he was pleasant and talkative; he was sitting comfortably in a chair; and he was oriented to person, place and time. Id. Dr. Shah's diagnostic assessment was that Kelly suffered from left upper extremity pain, brachial plexopathy and anxiety. Id. Dr. Shah refilled Kelly's prescriptions for methadone and oxycodone but also noted as follows: "The patient is actually out of oxycodone today which does not seem to correlate with the amount that was prescribed for him. . . The patient was counseled on the

appropriate use of opioids. However, the patient is adamant that he was using his medications appropriately." Id.

On June 12, 2012 (revised on July 16, 2012), Dr. Zager completed on behalf of Kelly a document entitled "Brachial Plexopathy Medical Source Statement." Tr. 716-718 and 720. In that document Dr. Zager stated that Kelly did not have peripheral neuropathy and his diagnostic assessment was that Kelly suffered from a severe left brachial plexus injury and his prognosis was poor to fair. Tr. 716. Dr. Zager stated that Kelly had increased sensitivity to touch, muscle spasm, weakness, sensory loss, decreased tendon reflexes, cramping, muscle atrophy, impaired sleep, and severe pain and paresthesias, all with respect to the left upper extremity, and that these conditions could be expected to last at least 12 months. Id. Dr. Zager noted that drowsiness was a side effect of Kelly's medications and that associated psychological problems were impaired attention and concentration, reduced ability to attend to tasks or persist in tasks, depression and anxiety. Tr. 717. Dr. Zager failed to give an indication as to how long in a competitive work situation Kelly could sit, stand or walk. Id. Dr. Zager reported that Kelly would need to take unscheduled breaks during a workday but did not note how many or for how long. Id. Dr. Zager noted that Kelly could never lift with his left arm but did not access Kelly's right arm; Kelly could rarely twist, stoop or crouch/squat; Kelly had significant

51

limitations with reaching, handling and fingering with the left arm; and Kelly had no use of his left upper extremity for grasping, turning and twisting objects, fine manipulation, reaching in front of the body and reaching overhead and had a 50% limitation with respect to the right arm. Tr. 718.  Dr. Zager did not explain why Kelly had a 50% limitation in the right arm.[40] Id. Dr. Zager stated that Kelly's symptoms would likely be severe enough to interfere with Kelly's attention and concentration 10% of a typical workday and that Kelly was incapable of even "low stress" work and was disabled by severe pain and weakness. Tr. 719.  Dr. Zager stated that Kelly's impairments were not likely to produce "good days" and "bad days" and that he would never be absent from work as a result of his impairments or treatment. Tr. 720.  On July 16, 2012, Dr. Zager revised one of his answers to the questions set forth in the medical source statement. Tr. 719. Dr. Zager on July 16th stated that Kelly would miss more than four days per month as the result of his impairments or treatment. Tr. 719.

On July 23, 2012, Kelly was examined at the request of Dr. Puccio by Farooq Qureshi, M.D., a spine specialist. Tr. 770-772. A physical examination performed by Dr. Qureshi was

---

40.  The court assumes that Dr. Zager is basing this assessment on Kelly subjective complaints of pain and his belief that Kelly's complaints were credible.

essentially normal other than with respect to Kelly's left upper extremity and he had some spasm in the trapezius, levator and scapular muscles. Tr. 771. Notably, Kelly had no edema; his gait and station were normal and nonantalgic; he was able to heel and toe walk without difficulty; his range of motion of the lumbar spine was intact; he had no palpable trigger points in the lower back and his strength and tone were normal; range of motion of the cervical spine was intact and he had no palpable pain; motor strength and reflexes in the right upper extremity and the bilateral lower extremities were normal. Id.  Dr. Qureshi's diagnostic assessment was that Kelly suffered from complex regional pain syndrome of the left upper extremity which developed as the result of his brachial plexus injury and he recommended that Kelly undergo a spinal cord stimulator trial which Kelly stated he would consider. Id.  Dr. Qureshi also recommended other medications, including the antidepressant Cymbalta, Lyrica and lidocaine patches which Kelly stated he would discuss with Dr. Baxter. Tr. 771-772.

Finally, on November 28, 2012, Kelly had an EMG of the bilateral upper extremities which revealed the following: (1) left median and ulnar motor and sensory polyneuropathy of primarily axonal in nature with some demyelinating involvement without plexopathy; (2) left ulnar motor and sensory peripheral neuropathy primarily demyelinating in nature across the wrist, consistent

53

with left Guyon's tunnel syndrome; and (3) bilateral median motor and sensory peripheral neuropathy primarily demyelinating in nature across both wrists, consistent with bilateral Carpal tunnel syndrome. Tr. 789.

## DISCUSSION

The administrative law judge at step one of the sequential evaluation process found that Kelly had not engaged in substantial gainful work activity since September 5, 2011, the alleged disability onset date. Tr. 19.

At step two of the sequential evaluation process, the administrative law judge found that Kelley had the following severe impairments: "status post fracture left upper extremity, bilateral fracture of wrists, status post left upper extremity nerve reconstruction surgery, left upper extremity brachial plexopathy with post traumatic pain; carpel tunnel syndrome . . ., depressive disorder and anxiety disorder[.]" Id. Kelly has not challenged the administrative law judge's step two determination.

At step three of the sequential evaluation process the administrative law judge found that Kelley's impairments did not individually or in combination meet or equal a listed impairment. Tr. 20-22. Kelly has not challenged the administrative law judge's step three determination.

At step four of the sequential evaluation process the administrative law judge found that Kelly could not perform his

past relevant unskilled to semi-skilled, medium to heavy work but
that he had the residual functional capacity to perform a limited
range of sedentary work. Tr. 22 and 29. Specifically, the
administrative law judge found that Kelly could perform sedentary
work as defined in the regulations but was

> limited to occupations, which can be performed with
> one upper dominant extremity with no functional use
> of the upper non-dominant extremity. [Kelly] is limited
> to occupations that require no more than occasional
> postural maneuvers, such as balancing, stooping,
> kneeling, crouching and climbing of ramps and stairs,
> but must avoid occupations that require climbing on
> ladders or crawling. [Kelly] must avoid concentrated
> prolonged exposure to environments with cold
> temperatures, excessive vibration, extreme dampness
> and humidity. [Kelly] is limited to occupations which
> do not require exposure to dangerous machinery and
> unprotected heights. [Kelly] is limited to occupations
> requiring no more than simple, routine, repetitive
> tasks, not performed in a faced-paced production
> environment, involving only simple, work-related
> decisions, and in general, relatively few work place
> changes.

Tr. 22. In setting this residual functional capacity, the
administrative law judge reviewed the medical records and relied
on the opinions of Dr. Maas, the state agency physician, and the
opinion of Dr. Vizza, the state agency psychologist, but gave
Kelly the benefit of the doubt and reduced his capacity from light
work to a very restrictive range of sedentary work. Tr. 24-29.
The administrative law judge also rejected the opinion of Dr.
Zager initially issued on June 12, 2012, and revised on July 16,

2012.  In so doing the administrative law judge stated in relevant part as follows:

> The undersigned gives little weight to the opinion of Dr. Zager . . . He opined [Kelly] could never lift or carry any weight with his left arm, but did not limit his right arm. [Kelly] would have significant limitations reaching, handling and twisting with his left arm, but not his right arm. [Kelly] could not use his left hand at all but use the right hand 50% to grasp, turn and twist objects and for fine finger manipulations. The claimant could not use his left arm at all but use the right arm 50% to reach in front of his body and overhead. [Kelly] would require unscheduled breaks during the workday, be off task 10% of the workday and would miss more than four days per month because of his impairments. It is noted by the undersigned that on the original opinion, Dr. Zager did not indicate the claimant would miss any days of work per month, but changed this one month later in the revision to missing four days per month.  He also found the claimant was incapable of even low stress work. Although the limitations as to the left upper extremity are consistent with the record, and are thus addressed in the RFC, the other .... limitations [enumerated by Dr. Zager] simply lack objective clinical support and are inconsistent with the record as a whole.  Dr. Zager's own most recent examination in June 2012 only reported abnormal findings as the claimant's left upper extremity. There were no deficits as to his right upper extremity.  Thus to limit the right upper extremity by "50%" was unfounded by his own objective examination. It was also inconsistent with not limiting the lifting and carrying for the right upper extremity by any exertional amount.  Furthermore, by March of 2012 the claimant began driving and by June fo 2012 was functioning at such a level where he moved out from his parent's home and began once again living on his own. Clearly these facts as well as the lack of significant abnormal objective deficits to the other parts of his body, besides his left upper extremity, fail to support such severe limitations.  Accordingly, little weight is given by the undersigned to this opinion.

Tr. 28. Also, a review of Dr. Baxter's treatment notes from March to mid-July, 2012, when Dr. Zager issued his opinion reveal that Dr. Baxter reported functional deficits in Kelly's left upper extremity with subjective complaints of pain but he did not report any functional deficits in Kelly's right upper extremity. Tr. 703-708, 785, 788 and 794-795.

In setting the residual functional capacity, the administrative law judge also found that Kelly's medically determinable impairments could reasonably be expected to cause his alleged symptoms but that his statements concerning the intensity, persistence and limiting effects of those symptoms were not credible to the extent they were inconsistent with the ability to perform a limited range of unskilled, sedentary work. Tr. 23.

In judging Kelly credibility the administrative law judge went into specific detail and enumerated several inconsistent claims made by Kelly. Tr. 27. The administrative law judge stated in part as follows:

> The claimant has testified he has not driven since the accident, but on further questioning by the undersigned and pointing out that the physical therapy progress notes from March of 2012 reported he resumed driving, he then grudgingly admitted to just driving to his parent's home on a rare occasion. The claimant testified he could only walk two football fields and sitting hurts and is a problem. However, . . . in the pain questionnaire from July of 2012, he states he could "sit as long as he would like" and "walk a quarter of a mile." Clearly these inconsistencies do nothing to bolster his credibility. (Hearing Testimony and Exhibit 26F). In addition, the claimant

57

could care for his personal needs; he could shower,
dress, feed himself and use the toilet.  He can prepare
meals, do household chores, drive and go shopping. He
` socializes, goes to bars, goes on Facebook, reads
and watches television (Hearing Testimony and Exhibit
3E).  Combining the claimant's inconsistent allegations
with his stated activities and the objective evidence of
record, it appears that he is functioning at a much
higher level than he would have the undersigned believe.
The undersigned has found the claimant's testimony as to
his functional capabilities, his alleged level of pain
and its associated physical and mental limitations to be
un-persuasive and lacking in credibility. Certainly as
per the medical evidence of record, the claimant can
function and sustain work as per the above stated RFC.

Tr. 27-28.  The administrative law judge concluded that the "RFC

gives [Kelly] the benefit of the doubt regarding [Kelly's] severe

impairments and . . . tailors restrictions to match what the

current medical evidence of record has substantiated." Tr. 29.

Based on the above residual functional capacity and the

testimony of a vocational expert the administrative law judge at

step five of the sequential evaluation process found that Kelly

could perform unskilled, sedentary work as a charge account clerk,

call out operator, and grinding machine operator, and that there

were a significant number of such jobs in the state and national

economies. Tr. 30.

Kelly  makes the following arguments: (1) the

administrative law judge erred in assessing Kelly's residual

functional capacity based on the conclusion that Kelly had

"quickly recovered" from his traumatic injuries; (2) the

58

administrative law judge erred in evaluating Kelly's description of his pain and functional limitations; and (3) the administrative law judge erred when he gave little weight to Dr. Zager's opinion.

The administrative record in this case is 800 pages in length, primarily consisting of medical and vocational records. The court has thoroughly reviewed the record in this case and finds no merit in Kelly's arguments. The administrative law judge did an excellent job of reviewing Kelly's vocational history and medical records in his decision. Tr. 17-31. Furthermore, the brief submitted by the Commissioner adequately reviews the medical and vocational evidence in this case. Doc. 16, Brief of Defendant.

Kelly's argument that the administrative law judge found that he quickly recovered and did not recognize the severity of Kelly's left arm impairment is baseless. The administrative law judge in his opinion clearly addressed Kelly's left arm impairment and agreed that Kelly had no functional use of his left arm. The administrative law judge, however, appropriately rejected Kelly's claims of disabling pain by enumerating Kelly's inconsistent statements and conduct. The administrative law judge's finding that Kelly could engage in a limited range of unskilled, sedentary work is supported by more than a mere scintilla of evidence. The administrative law judge relied on the opinions of Dr. Maas, the state agency physician, and Dr. Vizza, the state agency psychologist. The administrative law judge's reliance on those

opinions was appropriate. See Chandler v. Commissioner of Soc.
Sec., 667 F.3d 356, 362 (3d Cir. 2011)("Having found that the
[state agency physician's] report was properly considered by the
ALJ, we readily conclude that the ALJ's decision was supported by
substantial evidence[.]"). The court is satisfied that the
administrative law judge appropriately took into account all of
Kelly's mental and physical limitations in the residual functional
capacity assessment.

The administrative law judge stated that Kelly's
statements concerning the intensity, persistence and limiting
effects of his symptoms were not credible to the extent that they
were inconsistent with the ability to perform a limited range of
sedentary work. Tr. 23. The administrative law judge was not
required to accept Kelly's claims regarding his physical
limitations and pain. See Van Horn v. Schweiker, 717 F.2d 871, 873
(3d Cir. 1983)(providing that credibility determinations as to a
claimant's testimony regarding the claimant's limitations are for
the administrative law judge to make). It is well-established
that "an [administrative law judge's] findings based on the
credibility of the applicant are to be accorded great weight and
deference, particularly since [the administrative law judge] is
charged with the duty of observing a witness's demeanor . . . ."
Walters v. Commissioner of Social Sec., 127 f.3d 525, 531 (6th Cir.
1997); see also Casias v. Secretary of Health & Human Servs., 933

F.2d 799, 801 (10th Cir. 1991)("We defer to the ALJ as trier of fact, the individual optimally positioned to observe and assess the witness credibility."). Because the administrative law judge observed and heard Kelly testify, the administrative law judge is the one best suited to assess the credibility of Kelly.

The social security regulations specify that the opinion of a treating physician, in the present case Dr. Zager, may be accorded <u>controlling</u> weight only when it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the case. 20 C.F.R. § 404.1527(d)(2); SSR 96-2p. Likewise, an administrative law judge is not obliged to accept the testimony of a claimant if it is not supported by the medical evidence. An impairment, whether physical or mental, must be established by "medical evidence consisting of signs, symptoms, and laboratory findings," and not just by the claimant's subjective statements. 20 C.F.R. § 404.1508 (2007). The administrative law judge appropriately considered the contrary medical opinion of the state agency physicians and psychologist and the objective medical evidence and concluded that the disability opinion of Dr. Zager was not adequately supported by the objective medical evidence.

Our review of the administrative record reveals that the

decision of the Commissioner is supported by substantial evidence. The court will, therefore, pursuant to 42 U.S.C. § 405(g), affirm the decision of the Commissioner.

An Separate Order will be issued.

Date: September 16, 2015

/s/ William J. Nealon
United States District Judge